# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANTHONY FURFARI,<br><br>Plaintiff,<br><br>v.<br><br>PENSION BENEFIT GUARANTY CORPORATION,<br><br>Defendant. | Civil Action No. 20-2424 (CKK) |

## MEMORANDUM OPINION
(July 14, 2021)

This case involves Mr. Anthony Furfari's claim that he is entitled to a disability pension guaranteed by the Pension Benefit Guaranty Corporation ("PBGC"). Mr. Furfari first pursued his claim through administrative proceedings before the PBGC, but on April 18, 2018, the PBGC Appeals Board issued a final decision denying Mr. Furfari's benefit claim. Mr. Furfari now seeks judicial review of the PBGC's decision, and the parties' respective cross-motions for summary judgment are currently pending before the Court. Upon consideration of the pleadings, the relevant legal authorities, and the record as a whole,[1] the Court will **GRANT IN PART** Mr. Furfari's [20] Motion for Summary Judgment. Specifically, the Court will **VACATE** the April 18, 2018 Appeals Board decision and **REMAND** this case back to the PBGC for proceedings consistent with this Memorandum Opinion. In turn, the Court will **DENY WITHOUT PREJUDICE** the PBGC's [21] Cross-Motion for Summary Judgment.

---

[1] This Memorandum Opinion focuses on the following documents:
- Pl.'s Brief in Supp. of Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 20-2;
- Pl.'s Stmt. of Facts, ECF No. 20-3;
- Def.'s Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 21;
- Pl.'s Brief in Opp'n to Def.'s Mot. and in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 23;
- Def.'s Reply to Pl.'s Opp'n to Cross-Mot. for Summ. J. ("Def.'s Reply"), ECF No. 25; and,
- Joint Appendix ("JA"), ECF No. 26.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

# I.     BACKGROUND

## A.  Statutory Framework

One of the "principal purposes" of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, "was to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984) (citing *Nachman Corp. v. PBGC*, 446 U.S. 359, 361–62 (1980)).  To achieve this goal, Title IV of ERISA "created a plan termination insurance program, administered by the Pension Benefit Guaranty Corporation ("PBGC"), a wholly owned Government corporation within the Department of Labor." *Fisher v. PBGC*, 994 F.3d 664, 667 (D.C. Cir. 2021).  "If [the] PBGC determines that [a] plan lacks sufficient assets to satisfy its pension obligations, [the] 'PBGC becomes trustee of the plan, taking over the plan's assets and liabilities.'" *Id.* (quoting *PBGC v. LTV Corp.*, 496 U.S. 633, 639 (1990)).  "As trustee, the PBGC administers the plan—i.e., determines who is entitled to benefits, and acts as a fiduciary with respect to the plan." *Davis v. PBGC*, 734 F.3d 1161, 1165 (D.C. Cir. 2013) (internal citations omitted).

By statute, the PBGC guarantees certain "nonforfeitable benefits," 29 U.S.C. § 1322(a), by "reimbursing eligible participants or beneficiaries when a guaranteed plan terminates without sufficient funds," *Davis*, 734 F.3d at 1164.  A "nonforfeitable benefit" is defined as "a benefit for which a participant has satisfied the conditions for entitlement under the plan or the requirements of [ERISA]." 29 U.S.C. § 1301(a)(8).  One such "nonforfeitable benefit" guaranteed by the PBGC is "an annuity which is payable . . . under the terms of a plan on account of the total and permanent disability of a participant which is expected to last for the life of the participant[.]" 29 C.F.R. § 4022.6(a).  The PBGC, however, only guarantees such disability benefits where those benefits

"began on or before the termination date" of the relevant pension plan.  *Id.*; *see also Deppenbrook v. PBGC*, 778 F.3d 166, 169 (D.C. Cir. 2015) ("The PBGC guarantees only those benefits that are nonforfeitable as of the plan termination date.").  Where a plan sponsor files for bankruptcy and the bankruptcy proceeding has not been dismissed as of the termination date of the plan, the date of the bankruptcy petition operates as the plan termination date for the purposes of the PBGC's benefit guarantee obligations.  29 U.S.C. § 1322(g).

The PBGC "has promulgated regulations regarding how it handles benefit determinations."  *Davis*, 734 F.3d at 1166.  Under those regulations, the PBGC makes "initial determinations" regarding "a participant's or beneficiary's benefit entitlement and the amount of benefit payable under a covered plan."  29 C.F.R. § 4003.1(e)(2).  As a general matter, "[a]ll initial determinations . . . will be in writing, will state the reason for the determination, and . . . will contain notice of the right to request review of the initial determination."  *Id.* § 4003.21.  If a person receives an adverse initial determination from the PBGC, the aggrieved individual may file an appeal with the PBGC's Appeals Board.  *Id.* § 4003.51.  In their appeal, the aggrieved individual must "[s]pecifically explain why the PBGC's determination is wrong" and "[d]escribe the relevant information the appellant believes is known by [the] PBGC, and summarize any other information the appellant believes is relevant."  *Id.* § 4003.54(a)(3), (4).  The Appeals Board then renders a written decision after it "consider[s] those portions of the file relating to the initial determination, all material submitted by the appellant and any third parties in connection with the appeal, and any additional information submitted by PBGC staff."  *Id.* § 4003.59(a).

The PBGC's regulations also include an administrative exhaustion requirement.  *See id.* § 4003.7.  Thereunder, an individual challenging an adverse initial determination subject to review by the Appeals Board "has not exhausted his or her administrative remedies until he or she has

filed . . . an appeal" with the Appeals Board and "a decision granting or denying the relief requested has been issued." *Id.* "The decision of the Appeals Board constitutes the final agency action by [the] PBGC with respect to the initial determination which was the subject of the appeal and is binding on all parties who participated in the appeal[.]" *Id.* § 4003.59(b). Following a final decision from the Appeals Board, a plan participant or beneficiary who "is adversely affected by any action of the [PBGC] with respect to a plan in which such person has an interest . . . may bring an action against the [PBGC] for appropriate equitable relief in the appropriate court." 29 U.S.C. § 1303(f)(1).

**B. Factual and Procedural Background**

In September 1976, Mr. Anthony Furfari started working as a part-time packer for Riverside Markets, which was then a division of a corporation called the Penn Traffic Company ("Penn Traffic"). JA at 138–39. In 1985, Riverside Markets reclassified Mr. Furfari as a full-time grocery clerk. *Id.* at 140-001. Mr. Furfari continued to work as a grocery clerk with Riverside Markets until he suffered a work-related injury to his left shoulder in August 2005. *Id.* at 106-001. This shoulder injury required Mr. Furfari to undergo surgery in December 2005, which ultimately limited his ability to serve as a grocery clerk. *Id.* Mr. Furfari was later released to return to "light duty" work in 2006, but Riverside Markets did not have any light duty work for Mr. Furfari to perform. *Id.* Riverside Markets eventually terminated Mr. Furfari on December 1, 2006. *Id.* at 2-002.

At the time of his 2006 termination, Mr. Furfari was a participant in the Amendment and Restatement of the Riverside Division of Penn Traffic Company Bargaining Employees Pension

Plan (the "Pension Plan"),[2] *see id.* at 149-001; *id.* at 2-005, an amended version of the pension plan that Penn Traffic originally negotiated with the United Food and Commercial Workers Union in 1974, *id.* at 2-030. The Pension Plan was administered by a Joint Board of Trustees that was mutually selected by both Penn Traffic and the union. *Id.* Under the Pension Plan, a participant with at least fifteen years of credited service and covered employment terminated by reason of a "Total and Permanent Disability" could qualify for a disability pension. *Id.* at 2-081. Section 5.06(d) of the Pension Plan defines a "Total and Permanent Disability" as:

> [A] physical or mental condition of a Participant resulting from a bodily injury or disease or mental disorder which, in the sole judgment of the Trustees, will render the Participant totally unable ever to discharge or resume such part of his/her duties of employment with the Employer, or such other duties with the Employer, as the Trustees may determine and as are acceptable to the Employer, regardless of type or kind, deemed to be necessary to the Participant's satisfactory continued employment with the Employer.

*Id.* at 2-084; *see also id.* at 2-040 (defining "Employer" as the "Riverside Division of Penn Traffic Company" or other businesses contributing to the Pension Fund with Penn Traffic's approval). Under the Pension Plan, "[t]he determination of a Total and Permanent Disability of any Participant and entitlement to an award of a Disability Pension" was to be made by the plan's Trustees. *Id.* at 2-085.

In 2008, Mr. Furfari requested information from the Pension Plan administrators regarding his eligibility for a disability pension. On December 30, 2008, a benefits administrator named Beth Downey sent Mr. Furfari a letter confirming that, effective January 1, 2009, Mr. Furfari would be eligible for a disability pension of $626.84 per month. *Id.* at 147-001. Ms. Downey also stated in her December 30, 2008 letter, however, that Mr. Furfari "must be Social Security Disabled" to

---

[2] As used in this Memorandum Opinion, the "Pension Plan" refers to the "Amendment and Restatement of the Riverside Division of Penn Traffic Company Bargaining Employees Pension Plan," as amended and restated as of December 1, 2002. *See* JA at 2-026–2-086.

qualify for a disability benefit under the Pension Plan. *Id.* Mr. Furfari subsequently completed an application for a disability pension in April 2009. *Id.* at 143. With his application, Mr. Furfari included a signed statement from his treating physician, Dr. Michael Comas, M.D., declaring that Mr. Furfari was completely disabled. *Id.* at 81-001. On August 17, 2009, the Pension Plan sent Mr. Furfari a letter acknowledging the acceptance of his pension application, but also stating that Mr. Furfari's pension eligibility was "contingent on [him] receiving a[n] SSA disability award letter." *Id.* at 2-002. On November 18, 2009, however, Penn Traffic filed for bankruptcy, and on January 25, 2010, the Pension Plan was terminated without sufficient assets to cover its benefit obligations. *Id.* at 2-001. The record does not contain any final decision made by Penn Traffic regarding Mr. Furfari's disability pension application prior to the company's bankruptcy. *See* Pl.'s Stmt. of Facts, ECF No. 20-3, at ¶ 37; JA at 2-005.

Following Penn Traffic's bankruptcy, the PBGC became the trustee for the Pension Plan. *See* JA at 2-001. In 2013, the PBGC began providing Mr. Furfari early retirement benefits under the Pension Plan of approximately $275 per month, payable as a Joint and 100% Survivor Annuity. *Id.* But after an inquiry lodged by Plaintiff's Congressional representative in 2015, the PBGC also began to review Mr. Furfari's eligibility for a disability pension under the Pension Plan. *Id.* at 119-001. The PBGC responded in June 2015, informing Mr. Furfari that he was required to provide a Social Security disability award to demonstrate his eligibility for a disability pension under the Pension Plan. *Id.* at 118-001. Accordingly, Mr. Furfari sent a letter to the PBGC in November 2016, notifying the PBGC that he had been receiving Social Security disability benefits, effective as of October 26, 2010, and requesting that the PBGC reconsider his eligibility for a disability pension under the Pension Plan. *Id.* at 114-001, 117-005.

On February 17, 2017, the PBGC sent Mr. Furfari a benefit determination letter, denying

his request for a disability pension.  The PBGC's determination letter stated:

> The Pension Benefit Guaranty Corporation (PBGC) has completed a review of the plan and your records, and we have determined that you did not meet the eligibility requirements for a Disability Pension.  You would have had to have been declared disabled prior to the [Date of Plan Termination] of 1/25/2010.

*Id.* at 105-001.  On March 2, 2017, Mr. Furfari appealed this adverse benefit determination to the PBGC's Appeals Board.  *Id.* at 106.  In his appeal letter, Mr. Furfari asserted that he had last worked for Riverside Markets in 2005, and he also referenced medical records submitted to the PBGC, which demonstrated that he had been physically disabled well before the Pension Plan's January 25, 2010 termination date.  *Id.*  On April 18, 2018, however, the Appeals Board sent Mr. Furfari a decision letter, concluding that there was no basis to reverse the PBGC's benefit determination that Mr. Furfari was ineligible for a disability pension under the Pension Plan.  *Id.* at 2-001.

In its April 18, 2018 decision, the Appeals Board specifically observed that the original plan administrator with Penn Traffic had accepted Mr. Furfari's pension application, "contingent on [him] receiving a[n] SSA disability award letter."  *Id.* at 2-005.  That plan administrator had also noted that "if [Mr. Furfari] d[id] not receive a[n] SSA disability award, [he] would have to wait until . . . age 55 to receive a pension."  *Id.*  The Appeals Board, therefore, found it "evident that the prior Plan administrator interpreted the Plan to require proof of a Social Security disability award letter as proof of a Total and Permanent Disability" under Section 5.06(d) of the Pension Plan.  *Id.*  Mr. Furfari, however, had received a Social Security disability award effective only *as of October 26, 2010. Id.* at 117-005.  Because this Social Security award came *after* Penn Traffic's November 18, 2009 bankruptcy, the Appeals Board concluded that Mr. Furfari had not become eligible for a disability benefit under the Pension Plan until after the plan's termination date.  *Id.* at 2-006.  The Appeals Board, therefore, found that Mr. Furfari's disability benefit was not

7

guaranteed by the PBGC and upheld the agency's initial determination, denying Mr. Furfari's request for a disability pension under the Pension Plan. *Id.* at 2-007.

On April 27, 2020, Mr. Furfari filed a civil action in the United States District Court for the Western District of Pennsylvania, challenging the PBGC's denial of his disability benefits under the Pension Plan. *See* Compl., ECF No. 1, at ¶ 28. The Pennsylvania district court subsequently transferred Mr. Furfari's case to this Court, pursuant to 28 U.S.C. § 1404(a). *See* Order, ECF No. 11, at 1–2. On February 14, 2021, Mr. Furfari moved for summary judgment against the PBGC, requesting that this Court overrule the PBGC's benefit determination and award "him disability benefits in the amount of $626.84 per month as of April 1, 2009, plus interest," under the Pension Plan. Pl.'s Mot. at 15. In response, the PBGC filed a cross-motion for summary judgment, asking the Court to uphold the PBGC's decision to deny Mr. Furfari's claim for a disability pension. *See* Def.'s Mot. at 15. On June 30, 2021, the parties filed their joint appendix, which contains the relevant portions of the administrative record in this case. *See* Not. of Joint App'x, ECF No. 26, at 1. Accordingly, the parties' respective cross-motions are now ripe for this Court's review.

## II.    LEGAL STANDARD

"In the normal course, summary judgment may be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits or declarations show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as matter of law." *Fisher v. PBGC*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (quotations omitted), *aff'd*, 994 F.3d 664 (D.C. Cir. 2021). "In a case involving review of a final agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, however, the standard set forth in Rule 56(c) does not apply and summary judgment instead serves as a mechanism for deciding, as a matter of law, whether the

agency action is consistent with the APA standard of review." *Fisher*, 468 F. Supp. 3d at 18 (quotation omitted).

"Section 706(2)(A) of the APA allows a reviewing court to 'hold unlawful and set aside agency action' that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). In cases challenging the PBGC's benefit determination, courts "generally must apply the 'arbitrary or capricious' standard of the [APA]." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC v. PBGC*, 707 F.3d 319, 323 (D.C. Cir. 2013). "[U]nder 'arbitrary and capricious review,' the function of the district court is to determine whether 'the agency examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Fisher*, 468 F. Supp. 3d at 18 (*quoting Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020)); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## III.    DISUCSSION

Mr. Furfari presents a single argument in support of his request to overturn the PBGC's Appeals Board decision. According to Mr. Furfari, the PBGC's adverse determination violated the plain language of the Pension Plan by conditioning Mr. Furfari's eligibility for a disability pension on the receipt of a Social Security disability award. *See* Pl.'s Mot. at 8–14. In response, the PBGC first argues that Mr. Furfari waived this argument by failing to raise it before the Appeals Board. *See* Def.'s Mot. at 10–11. Alternatively, the PBGC contends that its reliance on a Social Security determination was reasonably in accordance with the Pension Plan. *See id.* at 11–14. For the reasons set forth below, the Court rejects the PBGC's positions. Instead, the Court will

**VACATE** the PBGC's Appeals Board decision and **REMAND** Mr. Furfari's case to the agency for further proceedings consistent with this Memorandum Opinion.

## A. Issue Exhaustion

Mr. Furfari argues that the April 18, 2018 Appeals Board decision violated the plain language of the Pension Plan by conditioning his eligibility for a disability pension on the receipt of a Social Security disability award. *See* Pl.'s Mot. at 8–14. As a threshold matter, the PBGC contends that Mr. Furfari waived this argument by failing to raise the issue before the PBGC's Appeals Board. *See* Def.'s Mot. at 10–11. For the reasons set forth below, the Court disagrees.

The PBGC's waiver argument falls within the doctrine of administrative "issue exhaustion." "[A]s a general proposition," this doctrine emphasizes "the need for parties seeking judicial review of agency action to raise their issues before the agency during the administrative process in order to preserve those issues for judicial review." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148 (D.C. Cir. 2005) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). Although neither party cites to it, "[t]he seminal case in this area" is *Sims v. Apfel*, 530 U.S. 103 (2000). *New LifeCare Hosps. of N. Carolina LLC v. Azar*, 466 F. Supp. 3d 124, 130 (D.D.C. 2020). In *Sims*, the Supreme Court explained that administrative issue exhaustion may apply where: (1) required by statute, (2) required by the agency's regulations, or (3) where a "judicially imposed issue-exhaustion requirement" is appropriate. *Sims*, 530 U.S. at 107–09.

In this case, the PBGC argues only for a judicially imposed issue exhaustion requirement, citing to the "hard and fast rule of administrative law" identified by the courts "that issues not raised before an agency are waived and will not be considered by a court on review." *Id.* at 11 (citing *Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004)). Moreover,

the Court itself has found no clear basis for an "issue exhaustion" requirement within the PBGC's governing statutes or the agency's regulations. *See* 29 C.F.R. § 4003.7 (setting forth agency requirement only for exhaustion of administrative *remedies*); *Davis v. PBGC*, No. CV 08-1064 (JR), 2009 WL 10457564, at *3 (D.D.C. Mar. 17, 2009). Therefore, the operative inquiry is whether a judicially mandated issue exhaustion requirement applies to Mr. Furfari and his administrative proceedings before the PBGC.

The analytical framework for this question is provided by *Sims*. There, the Supreme Court explained that "[t]he basis for a judicially imposed issue exhaustion requirement is an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Sims*, 530 U.S. at 108–09. As such, "the desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding." *Id.* at 109. "Where the parties are expected to develop the issues in an adversarial administrative proceeding . . . the rationale for requiring issue exhaustion is at its greatest." *Id.* at 110. But where "an administrative proceeding is not adversarial, . . . the reasons for a court to require issue exhaustion are much weaker." *Id.* Under this framework, for example, the *Sims* Court itself concluded that a proceeding before the Social Security Administration for a claimant's benefits was more "inquisitorial rather than adversarial." *Id.* at 111. Such Social Security proceedings, therefore, were too dissimilar from the traditional model of adversarial litigation to support "a judicially created issue-exhaustion requirement." *Id.* at 112.

To date, only one court in this jurisdiction has applied the *Sims* framework to an administrative proceeding before the PBGC. In *Davis v. PBGC*, Judge James Robertson confronted a request from the PBGC to disregard an argument presented to the district court because the plaintiff "never raised [it] before the PBGC Appeals Board." 2009 WL 10457564, at

*3. Judge Robertson considered this question as a matter of "issue exhaustion" and asked whether the PBGC proceeding below, like the Social Security proceeding in *Sims*, was "inquisitorial rather than adversarial." *Id.* at *4. Ultimately, Judge Robertson concluded that issue exhaustion *did not* apply to the PBGC proceeding:

> Though proceedings before the PBGC Appeals Board may be a bit more formal than those described in *Sims*, they are located on the inquisitorial portion of the spectrum: PBGC does not have a representative to argue against the beneficiaries' claims; the beneficiaries are not required to file a brief; and the Appeals Board can address issues that were not raised by the beneficiaries, and can evaluate material that was not submitted by the beneficiaries. Therefore, like the claimant in *Sims*, the plaintiffs here should be allowed to bring claims that they did not raise in their administrative appeal.

*Id.* (internal citations omitted).

As in *Davis*, the PBGC proceedings to which Mr. Furfari was a party were more "inquisitorial" and less analogous to the "normal adversarial litigation" process that would support an issue exhaustion requirement. *Sims*, 530 U.S. at 109. To start, the PBGC rendered its initial benefit determination on Mr. Furfari's pension eligibility, not after an adversarial hearing, but after an internal investigation conducted by agency personnel. *See* JA at 112–13. In fact, the PBGC's governing regulations do not provide for an adversarial hearing in advance of the agency's initial benefit determination on a request like the one submitted by Mr. Furfari. *See* 29 C.F.R. §§ 4003.1(a), 4.003.21. And following the agency's initial determination, Mr. Furfari appealed the PBGC's adverse determination without a lawyer and through a handwritten letter, *see* JA at 106, which the Appeals Board also considered unilaterally, absent any adversarial proceedings. Finally, it is notable that the Appeals Board is authorized to consider not only material raised by the claimant, but also material outside of the claimant's petition. *See* 29 C.F.R. §§ 4003.58(a), 4.003.59(a). Collectively, these characteristics demonstrate that Mr. Furfari's administrative

proceedings before the PBGC were "inquisitorial rather than adversarial" and, therefore, do not support a judicially imposed issue exhaustion requirement. *Sims*, 530 U.S. at 110.

Finally, the inapplicability of issue exhaustion in this case is highlighted by the basic unfairness it would cause Mr. Furfari. Again, the PBGC claims that to avoid waiver, Mr. Furfari should have argued before the Appeals Board that the agency erroneously conditioned his pension on a timely Social Security disability award. *See* Def.'s Mot. at 10. But in the initial determination that Mr. Furfari was actually appealing, the PBGC did not deny Mr. Furfari's benefit on that ground. Instead, the PBGC's benefit determination simply stated: "The Pension Benefit Guaranty Corporation (PBGC) has completed a review of the plan and your records, and we have determined that you did not meet the eligibility requirements for a Disability Pension. You would have had to have been declared disabled prior to the [Date of Plan Termination] of 1/25/2010." JA at 105-001.

As the PBGC acknowledges, this initial determination "was based strictly on the *date* that [Mr.] Furfari was found to be disabled" and says nothing about Mr. Furfari's failure to obtain a timely Social Security disability award. Def.'s Reply at 2. It is, therefore, unsurprising that when Mr. Furfari attempted to explain to the Appeals Board "why [the] PBGC's determination [wa]s wrong," he did not raise an argument that the PBGC itself did not include in its own initial determination. 29 C.F.R. § 4003.54(a)(3). Furthermore, as explained in detail below, the basic terms of Mr. Furfari's Pension Plan *did not* require a Social Security disability award as a condition for his pension eligibility. *See* disc. *infra* at § III.B. Accordingly, when explaining to the Appeals Board why he was, in fact, eligible for a disability benefit under the Pension Plan, there was no clear need under the terms of the Pension Plan for Mr. Furfari to make any arguments related to a Social Security award. In short, asking Mr. Furfari to raise issues about his Social Security

disability award before the Appeals Board would have required him to intuit reasoning that was not stated in the agency action he was challenging and to have made arguments unsupported by the terms of the operative Pension Plan. The inequity of this outcome reinforces the Court's conclusion that issue exhaustion does not apply to Mr. Furfari's largely "inquisitorial" administrative proceedings before the PBGC.

## B. Merits of the Appeals Board Decision

Next, the parties dispute the merits of the April 18, 2018 Appeals Board decision. In that decision, the Appeals Board upheld the PBGC's February 17, 2017 benefit determination, which denied Mr. Furfari's disability benefit under the Pension Plan. *See* JA at 2-007. The analysis set forth by the Appeals Board to support its decision is straightforward. To begin, the Appeals Board correctly observed that the PBGC only guarantees disability benefits where "the necessary conditions for entitlement to the benefit were satisfied" as of the plan termination date. *Id.* at 2-006; *see also* 29 C.F.R. § 4022.6(a); *Deppenbrook v. PBGC*, 778 F.3d 166, 169 (D.C. Cir. 2015) ("The PBGC guarantees only those benefits that are nonforfeitable as of the plan termination date."). The Appeals Board, therefore, set out to determine whether Mr. Furfari was eligible for a disability benefit under the Pension Plan before the Penn Traffic Company filed for bankruptcy on November 18, 2009. *See* JA at 2-005.

The Appeals Board concluded that Mr. Furfari did not meet the Pension Plan's eligibility standard before the November 18, 2009 termination date. To reach this result, the Appeals Board looked to Section 5.06(a) of the Pension Plan, which provided that "a Plan participant is eligible for the Plan's Disability Pension 'if his/her Covered Employment is subsequently terminated by reason of *Total and Permanent Disability* before he/she becomes eligible for a Normal Retirement Pension.'" *Id.* (emphasis added). In construing the term "Total and Permanent Disability," the

14

Appeals Board relied directly on the fact "that the prior Plan administrator" had "interpreted the Plan to require proof of a Social Security disability award letter as proof of Total and Permanent Disability." *Id.* Mr. Furfari's own Social Security disability determination, however, stated that he did not qualify as disabled under the Social Security Act until *October 26, 2010. Id.* at 2-006. Because of the timing of his Social Security award, the Appeals Board concluded that Mr. Furfari could not have been eligible for a disability benefit under the Pension Plan on or before the November 18, 2009 termination date and, therefore, was not guaranteed a disability pension by the PBGC. *Id.*

This Appeals Board decision cannot be reasonably squared with the terms of the Pension Plan. As a threshold matter, the parties do not dispute that the plain language of the Pension Plan controls in this case. In fact, the PBGC acknowledges that the question of "[w]hether and when a participant is disabled is based on the terms of the Pension Plan" itself. Def.'s Mot. at 11. And with regards to disability pensions, the PBGC's governing regulations stipulate that "an annuity which is payable . . . *under the terms of a plan* on account of the total and permanent disability of a participant . . . is considered to be a pension benefit." 29 C.F.R. § 4022.6(a) (emphasis added). In short, the PBGC's benefit determination regarding Mr. Furfari's disability pension under the Pension Plan was tied to the plan's plain language. *See Wagener v. SBC Pension Benefit Plan— Non Bargained Program*, 407 F.3d 395, 405 (D.C. Cir. 2005) ("Plan fiduciaries cannot claim deference for an interpretation of the Plan that . . . contradicts the Plan's plain language."); *Wright v. Metro. Life Ins. Co.*, 618 F. Supp. 2d 43, 57 (D.D.C. 2009) ("Where, as here, the plain language of a Plan's coverage provision leaves no room for ambiguity, it is reasonable to interpret the provision as written.") (quotation omitted and cleaned up).

The April 18, 2018 Appeals Board decision acknowledged that "any disability pension payable to [Mr. Furfari] would be based on the Plan's requirements for entitlement to a disability pension." JA at 2-005. Yet, the Appeals Board simultaneously diverged from the terms of the Pension Plan by requiring Mr. Furfari to provide "proof of a Social Security disability award letter as proof of a Total and Permanent Disability." *Id.* The plain language of the Pension Plan simply does not support this condition. Instead, Section 5.06(d) of the Pension Plan defines the term "Total and Permanent Disability" as:

> [A] physical or mental condition of a Participant resulting from a bodily injury or disease or mental disorder which, in the sole judgment of the Trustees, will render the Participant totally unable ever to discharge or resume such part of his/her duties of employment with the Employer, or such other duties with the Employer, as the Trustees may determine and as are acceptable to the Employer, regardless of type or kind, deemed to be necessary to the Participant's satisfactory continued employment with the Employer.

*Id.* at 2-084. Put otherwise, a plan participant sustained a "Total and Permanent Disability" within the meaning of the Pension Plan when: (1) the participant's disability prevented him from performing his current job, and (2) the participant was also unable to perform any other job "*with the Employer.*" *Id.* (emphasis added). And while Section 5.06(d) leaves the determination of a participant's disability status to "the sole judgment of the Trustees," such authority is not unbounded, but instead grants the Trustees discretion to determine whether *the two qualifying conditions* set forth within Section 5.06(d) are satisfied. Neither of these qualifying conditions require a plan participant to obtain a disability award from the Social Security Administration before becoming eligible for a disability pension.

This distinction is material. For a person to qualify as "disabled" under the Social Security Act, he must be (1) unable to perform his current job and (2) unable to "engage *in any other kind* of substantial gainful work which exists *in the national economy*, regardless of whether such work

exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A) (emphasis added). As such, the Social Security Administration's regulations require that an applicant must be unable to find "any other work" within "the national economy" before receiving disability benefits. 20 C.F.R. § 404.1560(c)(1); *see also id.* § 404.1520(g). The PBGC argues that this difference is merely "a matter of perspective," Def.'s Mot. at 14, but the Court disagrees. Conditioning disability benefits on an employee's inability to find alternative work *within his existing company* is quite different than conditioning disability benefits on that employee's inability to find alternative work *within the "national economy"* writ large. 42 U.S.C. § 423(d)(2)(A) (emphasis added).

Consider, for example, a grocery store clerk working for the Penn Traffic Company who can no longer carry out his function as a clerk because of a significant physical injury. Under Section 5.06(d) of the Pension Plan, that employee would have a "Total and Permanent Disability" so long as the injury rendered the clerk unable to perform his current job and "such other duties *with the Employer*, as the Trustees may determine and as are acceptable to the Employer, regardless of type or kind, deemed to be necessary to the Participant's satisfactory continued employment *with the Employer*." *Id.* at 2-084 (emphasis added). As the language of the Pension Plan makes clear, the clerk's disability status is tied to his inability to perform his present job and any other job with the Penn Traffic Company, i.e., "with the Employer." *See id.* at 2-040 (defining "Employer" under the Pension Plan). But what if while the clerk was unable to perform any job with the Penn Traffic Company because of his injury, he could still find work as a law firm secretary in a neighboring state? Under the terms of the Pension Plan, this new job opportunity would not change the clerk's disability status, because the new secretarial position would not be

"with" his current employer. *Id.* at 2-084. Under the Social Security Act, however, the secretarial job would eliminate the clerk's disability status, as he would now be able to engage in "*any other kind* of substantial gainful work which exists *in the national economy*." 42 U.S.C. § 423(d)(2)(A) (emphasis added). As this example demonstrates, the "national economy" provision of the Social Security disability standard is materially different from the disability standard in Section 5.06(d) of the Pension Plan.

Yet, the Appeals Board affirmed the denial of Mr. Furfari's disability pension specifically because Mr. Furfari did not receive a Social Security disability award by or before Penn Traffic's bankruptcy on November 18, 2009. The Appeals Board accepted this Social Security requirement as a condition for pension eligibility simply because "the prior Plan administrator interpreted the Plan to require proof of a Social Security disability award letter as proof of a Total and Permanent Disability" under the Pension Plan. JA at 2-005. The Appeals Board decision, however, does not explain why the prior plan administrator's interpretation was reasonable or how it comported with the plain language of the Pension Plan, which makes no reference to a required Social Security disability award. In fact, the Appeals Board decision does not even consider the full scope of Section 5.06(d) of the Pension Plan, which contains the operative language defining a "Total and Permanent Disability." Relatedly, the decision fails to acknowledge the clear distinction between the disability standard under Section 5.06(d) and the disability standard under the Social Security Act, described above. Indeed, the Appeals Board decision nowhere explains how this extra-textual reliance on Social Security standards complied with the PBGC's codified responsibility to determine "[w]hether and when a participant is disabled is based on the terms of the Pension Plan" itself. Def.'s Mot. at 11; *see also* 29 C.F.R. § 4022.4(a)(1) ("A participant . . . is entitled to a benefit if *under the provisions of a plan* . . . [t]he benefit was in pay status on the termination date

18

of the plan.") (emphasis added).[3]

In sum, the April 18, 2018 Appeals Board decision denied Mr. Furfari a disability benefit based expressly upon his failure to satisfy an eligibility condition that was not included under the terms of the operative Pension Plan. The Appeals Board offered no reasonable explanation as to why such a departure from the plain language of the Pension Plan was appropriate. In so doing, the PBGC failed to "articulate a satisfactory explanation for its action including a rational explanation of the facts found and the choice made." *Air All. Houston v. EPA*, 906 F.3d 1049, 1066 (D.C. Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Therefore, the April 18, 2018 decision from the Appeals Board cannot survive scrutiny, even under this Court's circumscribed APA review, and the Court will **VACATE** that decision, accordingly.

Nonetheless, the Court's holding is narrow. The Court takes no position, at this time, as to whether the ultimate result of the Appeals Board decision was correct. Rather, the Court finds only that the Appeals Board did not provide an adequate and reasonable explanation for reaching that result. *See State Farm*, 463 U.S. at 43. And because of this shortcoming, the Appeals Board decision and the administrative record presently before the Court do not directly address whether Mr. Furfari would have otherwise qualified for a disability pension under the terms of the Pension

---

[3] In its reply brief, the PBGC makes a passing reference to 29 C.F.R. § 4022.6(b) and argues that this regulation justified the agency's reliance on the Social Security disability standard in this case. *See* Def.'s Reply at 5. This argument fails, however, because there is no evidence in the record that the agency itself relied on this regulation when addressing Mr. Furfari's benefit request under the Pension Plan. Section 4022.6(b) provides that "[i]n any case in which the PBGC determines that the standards for determining such total and permanent disability under a plan were unreasonable, or were modified in anticipation of termination of the plan, the disability benefits payable to a participant under such standard shall not be guaranteed unless the participant meets the standards of the Social Security Act and the regulations promulgated thereunder for determining total disability." 29 C.F.R. § 4022.6(b). While this regulation might appear facially relevant, the specific Appeals Board decision now before the Court makes no reference to § 4022.6(b) and does not invoke the regulation as a basis for relying on the Social Security Act's disability standards. Without such an explanation in the Appeals Board decision itself, the PBGC cannot now rely on § 4022.6(b) to provide a *post hoc* rationale supporting the agency's ultimate benefit determination. *See American Textile Mfrs. Institute, Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("[T]he *post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action.").

Plan. Consequently, the Court will not grant Mr. Furfari his requested disability benefits outright, but instead will **REMAND** this action back to the PBGC for further proceedings consistent with this Memorandum Opinion.

## IV.    CONCLUSION

As explained in this Memorandum Opinion, the Court **GRANTS IN PART** Mr. Furfari's [20] Motion for Summary Judgment.  Specifically, the Court **VACATES** the April 18, 2018 Appeals Board decision and **REMANDS** this case back to the PBGC for proceedings consistent with this Memorandum Opinion.  Accordingly, the Court will **DENY WITHOUT PREJUDICE** the PBGC's [21] Cross-Motion for Summary Judgment.  An appropriate Order accompanies this Memorandum Opinion.

**Date**: July 14, 2021

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge
